Anthony Barnes (Bar No. 199048)
Email: amb@atalawgroup.com
Jason Flanders (Bar No. 238007)
Email: jrf@atalawgroup.com
AQUA TERRA AERIS LAW GROUP LLP
4030 Martin Luther King Jr. Way
Oakland, CA 94609
Telephone: (917) 371-8293

*Attorneys for Plaintiff*
CALIFORNIA SPORTFISHING PROTECTION ALLIANCE

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation,<br><br>Plaintiff,<br><br>vs.<br><br>CASS, INC., a California corporation,<br><br>Defendant. | Case No.: 4:22-cv-05384-DMR<br><br>~~[PROPOSED]~~ **CONSENT DECREE** |

# CONSENT DECREE

**WHEREAS,** California Sportfishing Protection Alliance (hereinafter "CSPA") is a non-profit entity dedicated to protecting California surface waters from pollution and degradation, among other objectives.

**WHEREAS**, CASS, Inc. ("CASS" or "Defendant") owns and operates an industrial facility at 2730 Peralta Street, Oakland, California, 94607 in Alameda County ("Facility").

**WHEREAS**, the Facility processes aluminum, and non-ferrous and ferrous metals to be baled for off-site shipment or recycled on-site into aluminum ingots. The Facility is categorized under Standard Industrial Classification ("SIC") Codes 5093 covering processing, reclaiming, wholesale distribution of scrap metal and waste materials and 3341, covering secondary smelting and refining of nonferrous metals

**WHEREAS**, stormwater discharges associated with industrial activity at the Facility are regulated by the National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001 [State Water Resources Control Board], Water Quality Order No. 2014-57-DWQ as amended in 2015 and 2018 ("General Permit" or "Permit"), and the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* ("Clean Water Act" or "CWA"), Sections 301(a) and 402, 33 U.S.C. §§ 1311(a), 1342;

**WHEREAS**, CSPA alleges that Defendant's operations at the Facility result in discharges of pollutants into waters of the United States and are regulated by the Clean Water Act Sections 301(a) and 402. 33 U.S.C. §§ 1311(a), 1342;

**WHEREAS**, the General Permit requires all permittees, including Defendant, to comply with, inter alia, the following mandates: (1) develop and implement a stormwater pollution prevention plan ("SWPPP") and a stormwater monitoring implementation plan ("MIP"), (2) control pollutant discharges using, as applicable, best available technology economically achievable ("BAT") or best conventional pollutant control technology ("BCT") to prevent or reduce pollutants through the development and application of Best Management Practices ("BMPs"), which must be included and timely updated in the SWPPP, (3) reduce and eliminate discharges necessary to

comply with any and all applicable Water Quality Standards ("WQS"), and (5) implement a monitoring and reporting program designed to assess compliance with the Permit;

**WHEREAS**, on March 4, 2022, Plaintiff issued a notice of intent to file suit ("60-Day Notice") to Defendant, the Administrator of the United States Environmental Protection Agency ("EPA"), the Executive Director of the State Water Resources Control Board ("State Water Board"), the Executive Officer of the San Francisco Bay Regional Water Quality Control Board ("Regional Water Board"), and the Regional Administrator of EPA Region IX, alleging violations of the Clean Water Act and the General Permit.

**WHEREAS**, on September 21, 2022, CSPA filed a complaint against CASS in the Northern District of California, Civil Case No. 4:22-cv-05384-DMR ("Complaint");

**WHEREAS**, Plaintiff's Complaint alleged violations of the General Permit and CWA for Defendant's discharges of pollutants into storm drains and surface waters of the San Francisco Bay Central ("Receiving Waters");

**WHEREAS**, CASS denies all allegations set forth in the 60-Day Notice and Complaint;

**WHEREAS**, Plaintiff and Defendant (collectively "Settling Parties" or "Parties") agree that it is in their mutual interest to enter into a Consent Decree setting forth terms and conditions appropriate to resolving the allegations set forth in the 60-Day Notice and Complaint without further proceedings;

**WHEREAS**, the Settling Parties hereby consent to magistrate jurisdiction for all purposes;

**WHEREAS**, all actions taken by the Defendant pursuant to this Consent Decree shall be made in compliance with all applicable federal, state and local rules and regulations.

**NOW THEREFORE IT IS HEREBY STIPULATED BETWEEN THE SETTLING PARTIES AND ORDERED AND DECREED BY THE COURT AS FOLLOWS:**

1.      The Court has jurisdiction over the subject matter of this action pursuant to Section 505(a)(1)(A) of the CWA, 33 U.S.C. § 1365(a)(1)(A);

2.      Venue is appropriate in the Northern District Court pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the Facility at which the alleged violations are taking place is located within this District;

3.      The Complaint states a claim upon which relief may be granted against Defendant pursuant to Section 505 of the CWA, 33 U.S.C. § 1365 and the Summons and Complaint shall be deemed served pursuant to Fed. R. Civ. P. 4;

4.      CSPA has standing to bring this action;

5.      The Court shall retain jurisdiction over this action for purposes of interpreting, modifying or enforcing the terms of this Consent Decree, or as long thereafter as necessary for the Court to resolve any motion to enforce this Consent Decree, but only regarding issue raised within the three (3) year term of this Consent Decree.

## I.   OBJECTIVES

6.      It is the express purpose of the Setting Parties through this Consent Decree to further the objectives of the Clean Water Act, and to resolve all issues alleged by CSPA in its 60-Day Notice and Complaint. These objectives include compliance with the provisions of this Consent Decree, compliance with all terms and conditions of the General Permit, and compliance with all applicable sections of the CWA.

7.      In light of these objectives and as set forth fully below, Defendant agrees to comply with the provisions of this Consent Decree, terms and conditions of the General Permit, and all applicable sections of the CWA at the Facility.

## II.  AGENCY REVIEW AND CONSENT DECREE TERM

### A.   AGENCY REVIEW OF CONSENT DECREE

8.      Agency Review. Plaintiff shall submit this Consent Decree to the United States Department of Justice and the EPA (the "Federal Agencies"), within three (3) business days of the final signature of the Parties, for agency review consistent with 40 C.F.R. § 135.5. The agency review period expires forty-five (45) calendar days after receipt by the Federal Agencies, as evidenced by certified return receipts, copies of which shall be provided to Defendant. In the event that the Federal Agencies object to entry of this Consent Decree, the Parties agree to meet and confer to attempt to resolve the issue(s) raised by the Federal Agencies.

9.     Court Notice. Plaintiff shall notify the Court of the receipt date by the Federal Agencies, as required by 40 C.F.R. § 135.5, in order to coordinate the Court's calendar with the 45-day review period.

10.     Entry of Consent Decree. Following expiration of the Federal Agencies' 45-day review period, Plaintiff shall submit the Consent Decree to the Court for entry.

### B.  EFFECTIVE DATE AND TERM OF CONSENT DECREE

11.     Effective Date. The Effective Date of this Consent Decree shall be the date of entry by the Court.

12.     Term & Termination. This Consent Decree shall terminate three (3) years from the Effective Date unless: 1) either the Facility satisfies the requirements of and receives an approval for a "Notice of Termination" ("NOT") as that term is defined in the General Permit, in which case the Consent Decree will terminate as to the Facility approved for NOT five (5) days after notice of the NOT approval is provided to CSPA, provided all monetary requirements owed under the Consent Decree are satisfied at that time; or 2) one of the Settling Parties has invoked Dispute Resolution in accordance with Section IV of this Consent Decree during the term of the Consent Decree, in which case the Consent Decree will terminate within the earlier of fifteen (15) days of notice by the Settling Parties that invoked Dispute Resolution that the dispute has been fully resolved or an order of the Court resolving the dispute and terminating the Consent Decree.

## III.  COMMITMENTS OF THE SETTLING PARTIES

### A.  STORM WATER POLLUTION CONTROL BEST MANAGEMENT PRACTICES

13.     Current and Additional Best Management Practices. In addition to maintaining the current Best Management Practices ("BMPs") described in the Facility's Storm Water Pollution Prevention Plan ("SWPPP"), Defendant shall (1) develop and implement BMPs identified herein, and (2) develop and implement additional BMPs necessary to comply with the provisions of this Consent Decree and the Storm Water Permit,  including but not limited to those that achieve the Best Available Technology Economically Achievable ("BAT") and the Best Conventional Treatment Technology ("BCT") as described in the General Permit. In addition, the Industrial General Permit Receiving Water Limitations require that industrial storm water discharges from the

Facility "not cause or contribute to an exceedance of any applicable water quality standards" contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan. Defendant shall develop and implement BMPs necessary to comply with the Industrial General Permit requirement to achieve compliance with BAT/BCT standards, to comply with the applicable water quality standards, and to prevent or reduce contamination in storm water discharges from the Facility in compliance with this Consent Decree.

14.     <u>Structural and Non-Structural BMPs for the Facility</u>. Within forty-five days of the Effective Date, Defendant shall develop and implement the following BMPs:

a.   Additional Infrastructure Modifications to CASS' Two Treatment Systems

i.   CASS shall install two (2) 6000-gallon tanks to the treatment system units, to provide additional treatment system optimization by providing treatment system flow equalization and settling. A 6000-gallon storage tank will be added to each treatment unit (one in the Main Yard and one in the New Yard). CASS shall modify its plumbing and make necessary site modifications to allow for this increased capacity.

ii.   CASS shall install oil/water separator skimmer socks in the oil/water separators at both the Main Yard and the New Yard. This will provide additional capacity to capture oil and grease prior to the treatment system. The skimmer socks will work in conjunction with the drop-in filters and spill socks installed in and around the catch basins upstream of the oil/water separators.

iii.   CASS shall install an oil shroud or equivalent shroud shall be fabricated and installed on the Aquip inlet at both the Main Yard and the New Yard. This will help capture and trap oil and grease and further reduce sediment in storm water entering the Aquip unit. The oil shrouds shall be inspected prior to and following storm events and changed, as necessary.

    b.  Additional Maintenance to CASS' Two Treatment Systems

        i.  CASS will increase the cleanout of the oil/water separators at both the Main Yard and New Yard to twice per year.

        ii.  The holding tanks at both the Main Yard and New Yard will be cleaned out annually by specialists.

        iii.  CASS shall paint the catch basin in the New Yard.

    c.  CASS shall place Filtrexx Targeted Socks Containing the EnviroSoxx Industrial Blend that specifically targets metals. The Filtrexx socks shall be placed in a multiphase filtration design upstream and around catch basins prior to a forecast rain event of 50% or greater of 0.1 inches[1] at or near the Facility.

    d.  Non-Structural BMPs and Enhanced Housekeeping

        i.  CASS shall observe the customer cleaning area within the facility boundary at the Public Work Area prior to a forecast rain event of 50% or greater of 0.1 inches and will conduct additional sweeping based on its observation during hours of operation.

        ii.  CASS shall implement a protocol that the facility keep the two doors along Poplar Street at the Furnace/Gardener Yard closed except when entering and leaving.

        iii.  CASS shall conduct a formal pre-rain protocol inspection on weekdays during hours of operation prior to a forecast storm event of 50% or greater of 0.1 inches.

        iv.  CASS shall use three SW8000 sweepers twice per shift.  The three sweepers have HEPA filters, hoses, and misting capabilities.

        v.  In areas inaccessible to the sweepers, CASS shall hand sweep or manual vacuum twice per shift.

---

[1] CASS will refer to www.wunderground.com prior to rain events to determine if the forecast is 50% or greater of 0.1 inches of rain for each applicable enhanced housekeeping requirement above in paragraph 14.d.

vi.   CASS shall inspect hazardous material and waste storage areas daily for proper implementation and maintenance of control measures and containment integrity.

vii.  CASS shall train employees on appropriate hazardous materials use and hazardous waste control and disposal procedures at the initial time of employment and then at least annually.

viii. CASS shall perform maintenance activities/work only in designated work areas.

ix.   When emergency maintenance activities must be performed outdoors, absorbent or spill trays should be laid down or readily available before any operational activity. Care shall be taken to immediately contain, capture and clean up any discharge or spill of waste auto fluids to the ground.

x.    CASS shall maintain spill clean-up supplies at all fluid storage, hydraulic press, and maintenance areas.

xi.   CASS shall not leave drip pans or open waste containers unattended. Transfer wastes to proper containers as soon as practical, but at the minimum at the end of the workday.

xii.  CASS shall inspect operation work areas daily to ensure adequate implementation and maintenance of operational procedures and control measures.

xiii. CASS shall train all staff on proper operating procedures and control measures at the time of initial arrival at the Facility and then at least annually.

**B.  SAMPLING AT THE FACILITY**

15.   CASS shall develop a monitoring program consistent with the General Permit. During the term of this Consent Decree, Defendant shall collect storm water samples from each Discharge Location as identified in its then-current SWPPP from at least four (4) Qualifying Storm Events ("QSEs") as required by the General Permit (i.e., two QSE during the first half of the Reporting Year and two QSEs during the second half of the Reporting Year). A Qualifying Storm

Event is a precipitation event that produces a discharge from at least one (1) drainage area and is preceded by forty-eight (48) hours with no discharge from any drainage area. Any failure to collect samples as required by this Consent Decree shall be documented and submitted to CSPA by email within five (5) days of the date a sample should have been collected but was not. If, prior to February 1 of a Reporting Year, CASS has collected samples from two (2) or fewer QSEs, CASS shall, to the extent feasible, collect samples during as many QSEs as necessary until a minimum of 4 QSEs have been sampled for the Reporting Year. No two (2) samples may be from the same storm event.

16.     Sampling Parameters. All samples collected pursuant to this Consent Decree shall be analyzed for the parameters listed in Table 1.

17.     Laboratory and Holding Time. Except for pH samples, delivery of all samples to a California state certified environmental laboratory for analysis within allowable hold times, pursuant to 40 C.F.R. Part 136.

18.     Detection Limit. Defendant shall request that the laboratory use analytical methods adequate to detect the individual contaminants at or below the values specified in the General Permit and Table 1 below.

19.     Reporting. Defendant shall provide complete laboratory results of all samples collected at the Facility to CSPA within fourteen (14) days of receiving the results.

## C.  REDUCTION OF POLLUTANTS IN DISCHARGES

20.     Table 1 Numeric Limits: Defendant shall develop and implement BMPs to reduce pollutants in storm water at the Facility to levels below those in Table 1. Table 1 Exceedances are defined as follows: beginning with the 2022-2023 Reporting Year, in any Reporting Year under the term of this Consent Decree an Action Plan shall be required if 1) the annual average (Annual NAL) of all storm water analytical results for individual pollutant(s) exceeds any of the applicable limits as set forth in Table 1; or 2) any two storm water discharge samples contain a single pollutant at a concentration that exceeds an Instantaneous NAL as set forth in Table 2 of the Permit (i.e., for TSS, O&G and pH). In any Reporting Year during which Defendant receives a final laboratory report(s) of sampling completed under paragraph 15 of this Agreement that demonstrates an Exceedance of

Table 1, as defined above, Defendant shall prepare and submit to CSPA a plan for reducing and/or eliminating the discharge of pollutants for the Facility ("Action Plan"). Each Action Plan shall be submitted to CSPA no later than forty-five days (45) days after the Facility receives the laboratory report(s) for the fourth, or final if there is not a fourth due to lack of QSEs, storm water sample in the Reporting Year, which shall be the last sample taken on or before June 30 of the Reporting Year. Any required Action Plan must be sent by July 31 following any Reporting Year. In no event shall more than one Action Plan be required per Reporting Year. Each Action Plan must address each Exceedance of a Table 1 analyte separately.

TABLE 1

| Analytes | Values | Source of Limit |
|---|---|---|
| Total Suspended Solids | 100 mg/L | Annual NAL |
| | 400 mg/L | Instantaneous NAL |
| Oil & Grease | 15 mg/L | Annual NAL |
| | 25 mg/L | Instantaneous NAL |
| Chemical Oxygen Demand | 120 mg/L | Annual NAL |
| Zinc | 0.26 mg/L | Annual NAL |
| Copper | 0.0332 mg/L | Annual NAL |
| Lead | 0.262 mg/L | Annual NAL |
| Iron | 1 mg/L | Annual NAL |
| Aluminum | 0.75 mg/L | Annual NAL |
| pH | 6.0-9.0 s.u. | Instantaneous NAL |

21. <u>Action Plan Requirements</u>. Each Action Plan submitted shall include at a minimum: (1) the identification of the contaminant(s) discharged in excess of the numeric limit(s); (2) an assessment of the source of each contaminant exceedance; (3) the identification of additional BMPs and/or modified BMPs that shall be implemented to improve the storm water management practices to prevent future exceedances and help achieve compliance with the numeric limit(s); and (4) time schedules for implementation of the proposed BMPs. The time schedule(s) for implementation shall ensure that all BMPs are implemented as soon as possible, but in no case later than October 1 of the upcoming Reporting Year. Defendant shall notify CSPA in writing when an Action Plan has been implemented.

9

     a.   <u>Action Plan After the 2023-2024 Reporting Year</u>. If an Action Plan is required after the 2023-2024 Reporting Year, Defendant shall evaluate, based on all storm water sample results, observations, and performance of the existing storm water treatment systems with the upgrades required in paragraph 14 of this Consent Decree, whether to install a polishing treatment component to the existing storm water treatment systems. The Defendant shall provide its findings in writing setting forth the type of polishing component chosen or any other alternative proposal to the existing stormwater system based on all storm water sample results and observations. Any disputes as to the adequacy of an Action Plan shall be resolved pursuant to the dispute resolution provisions of this Consent Decree, set out in Section IV Below.

     b.   <u>Action Plan Review</u>. CSPA shall have twenty (20) days upon receipt of Defendant's Action Plan to provide Defendant with comments. Within thirty (30) days of receiving CSPA's proposed revisions to an Action Plan, Defendant shall consider each of CSPA's recommended revisions and accept them or justify in writing why any comment is not incorporated. Action Plan(s) developed and implemented pursuant to this Consent Decree are an obligation of this Consent Decree. Any disputes as to the adequacy of an Action Plan shall be resolved pursuant to the dispute resolution provisions of this Consent Decree, set out in Section IV below.

**D.  VISUAL OBSERVATIONS**

22.   <u>Storm Water Discharge Observations</u>. During the term of this Consent Decree, Defendant shall conduct sampling event visual observations during the Facility's operating hours during QSEs from the Facility per General Permit section XI.A.2, and visual observations on weekdays of all QSEs from the Facility during operating hours.

23.   <u>Non-Storm Water Discharge Observations</u>. During the term of this Consent Decree, Defendant shall conduct monthly non-storm water visual observations at each discharge location.

24.     <u>Visual Observations Records</u>. Defendant shall maintain observation records to document compliance with paragraphs 22 and 23 and shall provide CSPA with a copy of those records within fourteen (14) days of receipt of a written request from CSPA for those records.

25.     <u>Employee Training Program</u>. Within forty-five days of the Effective Date, Defendant shall develop and implement an employee training program that meets the following requirements and ensures (1) that there is a sufficient number of employees at the Facility designated to achieve compliance with the General Permit and this Consent Decree ("Designated Employees"), and (2) that these Designated Employees are properly trained to perform the activities required by the General Permit and this Consent Decree ("Training Program"):

a.     <u>Language</u>. The training and training materials shall be available and offered in the language(s) in which relevant employees are fluent. If necessary, Defendant shall provide a translator or translators at all trainings where such translation is likely to improve staff comprehension of the Training Program and improve compliance with this Consent Decree and the General Permit.

b.     Training shall be provided by a Qualified Industrial Storm Water Practitioner ("QISP", as defined in Section IX.A of the General Permit) familiar with the requirements of this Consent Decree and the General Permit, and shall be repeated as necessary to ensure that all relevant employees are familiar with the requirements of this Consent Decree, the General Permit, and the Facility's SWPPP. All relevant new staff shall receive this training before assuming responsibilities for implementing the SWPPP.

c.     <u>Sampling Training</u>. Defendant shall designate an adequate number of employees necessary to collect storm water samples as required by this Consent Decree, including training to ensure samples are properly collected, stored, and submitted to a certified laboratory.

d.     <u>Visual Observation Training</u>. Defendant shall provide training on how and when to properly conduct visual observations to Designated Employees.

e.     <u>Non-Storm Water Discharge Training</u>. Defendant shall train all Designated Employees at the Facility on the General Permit's prohibition of non-storm water

[PROPOSED] CONSENT DECREE

discharges, so that Designated Employees know what non-storm water discharges are and how to detect and prevent non-storm water discharges.

f. Employees. All Designated Employees at the Facility shall participate in the Training Program annually. New Designated Employees shall participate in the Training Program within thirty (30) days of their hiring date.

g. The Defendant shall maintain training records to document compliance with this paragraph and shall provide CSPA with a copy of these records within fourteen (14) days of receipt of a written request.

h. Identification of Storm Water Pollution Prevention Team and Training Program Updates into SWPPP. Within thirty (30) days of the Effective Date, Defendant shall update the SWPPP to identify the positions responsible for carrying out storm water management, monitoring, sampling and SWPPP implementation.

26.  SWPPP and Monitoring Implementation Plan ("MIP") Revisions and Update. Within thirty (30) days of the Effective Date, Defendant shall amend the Facility's SWPPP and MIP to incorporate the requirements in this Consent Decree.  Defendant agrees to submit the updated SWPPP and MIP to CSPA upon completion for review and comment.

a. Review of SWPPP and/or MIP. CSPA shall have thirty (30) days from receipt of the amended SWPPP and/or MIP to propose any changes. Within thirty (30) days of receiving CSPA's comments and proposed changes to the SWPPP, Defendant shall consider each of the comments and proposed changes and either accept them or justify in writing why a change is not incorporated;

b. Defendant shall revise the SWPPP and MIP if there are any significant changes in the Facility's operations, including but not limited to changes in storm water discharge points or BMPs within thirty (30) days of the changes, which will be subject to CSPA's review and comment as provided in paragraph 26 (a) above.

c. The Parties agree to work in good faith to resolve any disputes with respect to the SWPPP or MIP, and any remaining disputes will be resolved through timely initiation of the dispute resolution procedures in Section IV below.

### E. COMPLIANCE MONITORING AND REPORTING

27.     Every year during the term of this Consent Decree, CSPA may conduct one annual site inspection ("Site Inspection") for the purpose of ensuring compliance with this Consent Decree and the General Permit. In the event of a dispute regarding Defendant's compliance with this Consent Decree, and provided a Site Inspection would be relevant to resolving the Parties' dispute, the Parties agree to meet and confer regarding one additional Site Inspection for the term of the Consent Decree at Plaintiff's request. Plaintiff shall not unreasonably request, and Defendant shall not unreasonably deny, one additional Site Inspection. Any Site Inspection shall occur Monday through Friday, excluding Federal and religious holidays, between 9:00 a.m. and 4:00 p.m. CSPA will provide Defendant with as much notice as possible—but at least forty-eight (48) hours' notice prior to a Site Inspection in anticipation of wet weather, and seventy-two (72) hours' notice during dry weather. For any Site Inspection requested to occur in wet weather, Plaintiff shall be entitled to adjust timing or reschedule during normal business hours in the event the forecast changes and anticipated precipitation appears unlikely, and thus frustrates the purpose of visiting the Facility in wet weather. Notice will be provided by telephone and electronic mail to the individual(s) designated below at paragraph 54. During the Wet Weather inspection, Plaintiff may request that Defendant collect a sample of industrial storm water discharge from the Facility's designated industrial discharge point(s) referenced in its then- current SWPPP, to the extent that such discharges are occurring. Defendant shall collect the sample and provide a split sample to CSPA. CSPA's representative(s) may observe the split sample(s) being collected by Defendant's representative. Prior to the Site Inspection, CSPA's representative(s) shall sign the Site Visit Agreement attached as Exhibit A to this Consent Decree. CSPA shall be permitted to take photographs or video recording during any Site Inspection pursuant to the terms in the Site Visit Agreement. CSPA will limit inspection participants to three individuals, all of whom agree to execute the attached Assumption of Risk, Release, and Indemnity Agreement (included as an attachment to Exhibit A) prior to entering the Facility.

28.     Document Provision. During the term of this Consent Decree, Defendant shall notify and submit documents to CSPA as follows:

a.   Defendant shall copy CSPA on all compliance documents, monitoring and/or sampling data, written communications and/or correspondences, or any documents related to compliance with the General Permit and/or this Consent Decree  at the Facility that are submitted to the Regional Board, the State Board, and/or any state or local agency, county or municipality.

b.   Any compliance document, inspection report, written communication and/or correspondence, or any document related to compliance with the General Permit and/or this Consent Decree at the Facility received by Defendant from the Regional Board, the State Board, and/or any state or local agency, county, municipality shall be sent to CSPA within three (3) business days of receipt by Defendant. Defendant shall mail paper copies or email electronic copies of documents to CSPA at the relevant notice address contained below.

29.     <u>Compliance Monitoring</u>. To partially defray costs associated with Plaintiff's monitoring of Defendant's compliance with this Consent Decree, Defendant agrees to pay Nine Thousand dollars ($9,000.00) within thirty (30) days of the Effective Date payable to: Aqua Terra Aeris Law Group LLP, Attn: Anthony M. Barnes and delivered by overnight carrier to Aqua Terra Aeris Law Group, 4030 Martin Luther King Jr. Way, Oakland, CA 94609.

30.     Failure to submit payment as required under this paragraph will constitute breach of the Consent Decree.

F.   **ENVIRONMENTAL MITIGATION, LITIGATION FEES AND COSTS, STIPULATED PENALTIES, AND INTEREST**

31.     <u>Environmental Mitigation Project</u>. To fund environmental project activities that will reduce or mitigate the impacts of storm water pollution from industrial activities occurring in watersheds adjacent to the San Francisco Bay, Defendant agrees to make a total payment of Twenty-Eight Thousand Dollars ($28,000.00) to the Rose Foundation made within sixty (60) days of the Effective Date, payable to the Rose Foundation for Communities and the Environment and sent via overnight mail to Rose Foundation, 201 4th St APT 102, Oakland, CA 94607. Defendant shall provide CSPA with a copy of such payment.

32.     <u>CSPA's Fees and Costs</u>. To partially reimburse Plaintiff for its investigation fees and costs, expert/consultant fees and costs, reasonable attorneys' fees, and other costs incurred as a

result of investigating and filing the lawsuit, and negotiating a resolution of this matter, Defendant agrees to pay a total of Forty-Eight Thousand ($48,000.00) to CSPA within thirty (30) days of the Effective Date, made payable to: Aqua Terra Aeris Law Group LLP, Attn: Anthony M. Barnes and delivered by overnight carrier to Aqua Terra Aeris Law Group, 4030 Martin Luther King Jr. Way, Oakland, CA 94609.

## IV. DISPUTE RESOLUTION

33.     This Court shall retain jurisdiction over this matter for the term of this Consent Decree for the purposes of enforcing its terms and conditions, and adjudicating all disputes among the Parties that may arise under the provisions of this Consent Decree. The Court shall have the power to enforce this Consent Decree with all available legal and equitable remedies, including contempt.

34.     <u>Meet and Confer</u>. Either party to this Consent Decree may invoke the dispute resolution procedures of this Section IV by notifying the other party in writing of the matter(s) in dispute and of the disputing party's proposal for resolution. The Parties shall then meet and confer in good faith (either telephonically or in person) within fourteen (14) days of the date of the notice in an attempt to fully resolve the dispute.

35.     <u>Settlement Conference</u>. If the Parties cannot resolve the dispute within thirty (30) days of the meet and confer described in paragraph 34, the Parties agree that the dispute may be submitted for formal resolution by filing a motion before the United States District Court for the Northern District of California. The Parties agree to request an expedited hearing schedule on the motion.

36.     In resolving any dispute arising from this Consent Decree before the Court, the Parties shall be entitled to seek fees and costs incurred pursuant to the provisions set forth in Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), applicable case law interpreting such provisions, or as otherwise provided for by statute and/or case law.

## V. MUTUAL RELEASE OF LIABILITY AND COVENANT NOT TO SUE

37.     <u>Plaintiff's Waiver and Release of Defendant</u>. In consideration of the above, upon the Effective Date of this Consent Decree, Plaintiff, on its own behalf and on behalf of its officers and directors, release Defendant, its officers, directors, managers, employees, members, parents,

subsidiaries, divisions, affiliates, successors or assigns, agents, property owners (including all trusts, trustees, and beneficiaries), attorneys and other representatives, from and waives all claims that were or could have been raised based on the 60-Day Notice and/or the Complaint up to and including the Termination Date of this Consent Decree.

38.     <u>Defendant's Waiver and Release of Plaintiff</u>. In consideration of the above, upon the Effective Date of this Consent Decree, Defendant, on its own behalf and on behalf of its officers, directors, employees, parents, subsidiaries, affiliates and each of their successors or assigns, release Plaintiff, its officers, directors, managers, employees, members, attorneys and other representatives from and waives all claims related to the 60-Day Notice and/or the Complaint up to and including the Termination Date of this Consent Decree.

39.     Nothing in this Consent Decree limits or otherwise affects Plaintiff's rights to address or take any position that it deems necessary or appropriate in an informal or formal proceeding before the State Water Board, Regional Water Board, EPA, or any other judicial or administrative body on any matter relating to Defendant's compliance at the Facility with the General Permit or the Clean Water Act occurring or arising after the Effective Date.

## VI.  MISCELLANEOUS PROVISIONS

40.      <u>No Admission of Liability</u>. The Parties enter into this Consent Decree for the purpose of avoiding prolonged and costly litigation. Neither the Consent Decree nor any payment pursuant to the Consent Decree shall constitute or be construed as a finding, adjudication, or acknowledgement of any fact, law or liability, nor shall it be construed as an admission of violation of any law, rule, or regulation. The Defendant maintains and reserves all defenses it may have to any alleged violations that may be raised in the future.

41.     <u>Counterparts</u>. This Consent Decree may be executed in any number of counterparts, all of which together shall constitute one original document.  Telecopy, electronic mail, and/or facsimile copies of an original signature shall be deemed to be originally executed counterparts of this Consent Decree.

42.     <u>Authority</u>. The undersigned representatives for Plaintiff and Defendant each certify that s/he is fully authorized by the party whom s/he represents to enter into this Consent Decree. A

Party's signature to this Consent Decree transmitted by facsimile or electronic mail shall be deemed binding.

43.    <u>Construction</u>. The language in all parts of this Consent Decree shall be construed according to its plain and ordinary meaning, except as to those terms defined in the General Permit, the Clean Water Act, or specifically herein. The captions and paragraph headings used in this Consent Decree are for reference only and shall not affect the construction of this Consent Decree.

44.    <u>Full Settlement</u>. This Consent Decree constitutes a full and final settlement of this matter.

45.    <u>Integration Clause</u>. This is an integrated Consent Decree. This Consent Decree is intended to be a full and complete statement of the terms of the agreement between the Parties and expressly supersedes any and all prior oral or written agreements, covenants, representations, and warranties (express or implied) concerning the subject matter of this Consent Decree.

46.    <u>Severability</u>. In the event that any provision, paragraph, section, or sentence of this Consent Decree is held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

47.    <u>Choice of Law</u>. The laws of the United States shall govern this Consent Decree.

48.    <u>Diligence</u>. Defendant shall diligently file and pursue all required permit applications for the structural BMPs and shall diligently procure contractors, labor, and materials needed to complete all BMPs by the required deadlines.

49.    <u>Effect of Consent Decree</u>. Compliance with this Consent Decree does not mean that Defendant is complying with the General Permit, the Clean Water Act, or any other law, rule, or regulation.

50.    <u>Negotiated Settlement</u>. The Settling Parties have negotiated this Consent Decree, and agree that it shall not be construed against the party preparing it, but shall be construed as if the Settling Parties jointly prepared this Consent Decree, and any uncertainty and ambiguity shall not be interpreted against any one party.

51.    <u>Modification of the Consent Decree</u>. This Consent Decree, and any provisions herein, may not be changed, waived, discharged, or terminated unless by a written instrument,

---

17

signed by the Parties. In the event that there is a dispute regarding a change, waiver, discharge or termination of any provision(s), either Party may seek resolution from the court.

52.    Assignment. Subject only to the express restrictions contained in this Consent Decree, all of the rights, duties and obligations contained in this Consent Decree shall inure to the benefit of and be binding upon the Parties, and their successors and assigns. Defendant shall notify Plaintiff within ten (10) days of any assignment.

53.    Force Majeure. Neither of the Parties shall be considered to be in default in the performance of any of their respective obligations under this Consent Decree when performance becomes impossible due to a Force Majeure event. A Force Majeure event is any circumstance beyond a Settling Party's control, including without limitation, any act of God, war, fire, earthquake, flood, windstorm, or natural catastrophe; criminal acts; civil disturbance, vandalism, sabotage, or terrorism; restraint by court order or public authority or agency; or action or non-action by, or inability to obtain the necessary authorizations or approvals from any governmental agency; government orders or restrictions related to COVID-19 or comparable public health threats. A Force Majeure event shall not include normal inclement weather, economic hardship, inability to pay, or employee negligence. Any party seeking to rely upon this paragraph to excuse or postpone performance shall have the burden of establishing that it could not reasonably have been expected to avoid the Force Majeure event and which by exercise of due diligence has been unable to overcome the failure of performance. The Parties shall exercise due diligence to resolve and remove any Force Majeure event.

54.    Correspondence. All notices required herein or any other correspondence pertaining to this Consent Decree shall be, the extent feasible, sent via electronic mail transmission to the e-mail address listed below, or if electronic mail is not feasible, then by certified U.S. mail with return receipt, or by hand delivery to the following addresses:

If to Plaintiff:
Anthony M. Barnes
Aqua Terra Aeris Law Group LLP
4030 Martin Luther King Jr. Way
Oakland, CA 94609
amb@atalawgroup.com
(917) 371-8293

If to Defendant:
Ruben A. Castellón
RAF Law Group
811 Wilshire Blvd., Suite 1050
Los Angeles, CA  90017
rcastellon@raflawgroup.com
(213) 623-7515

| | |
|---|---|
| With copies to: | With copies to: |
| Chris Shutes, Acting Executive Director | Edward B. Kangeter IV |
| California Sportfishing Protection Alliance | Chief Executive Officer |
| 3536 Rainier Ave, | CASS, Inc. |
| Stockton, CA 95204 | 2730 Peralta Street |
| blancapaloma@msn.com | Oakland, CA 94607 |
| (510) 421-2405 | Edward@customalloy.com |
| | (510) 893-6476 |

Notifications of communications shall be deemed submitted three (3) days after the date that they are postmarked and sent by first-class mail, or immediately after acknowledgement of receipt via email by the receiving party. Any change of address or addresses shall be communicated in the manner described above for giving notices.

55.     If for any reason the DOJ or the District Court should decline to approve this Consent Decree in the form presented, the Parties shall use their best efforts to work together to modify the Consent Decree within thirty (30) days so that it is acceptable to the DOJ or the District Court. If the Parties are unable to modify this Consent Decree in a mutually acceptable manner that is also acceptable to the DOJ or the District Court, this Consent Decree shall immediately be null and void as well as inadmissible as a settlement communication under Federal Rule of Evidence 408 and California Evidence Code section 1152.

The Parties hereto enter into this Consent Decree and submit it to the Court for its approval and entry as a final judgment.

IN WITNESS WHEREOF, the undersigned have executed this Consent Decree as of the date set forth below.

APPROVED AS TO CONTENT

Dated: September 23, 2022          By: _____
                                        Chris Shutes, Acting Executive Director
                                        California Sportfishing Protection Alliance

Dated: Sept 28, 2022                By: _____
                                        Edward B. Kangeter IV
                                        CASS, Inc.

19
[PROPOSED] CONSENT DECREE

1

2   APPROVED AS TO FORM

3   Dated: _September 22___, 2022                          By: _____
4                                                              Anthony M. Barnes
5                                                              Attorney for Plaintiff
                                                             California Sportfishing Protection Alliance
6

7   Dated: _September 28___, 2022                          By: _____
8                                                              Ruben Castellón
                                                             Attorney for Defendant
9                                                              CASS, Inc.

10

11

12

13   IT IS SO ORDERED.

14

15

16   Dated: _Nov. 28, 2022___,

17

18

19                                                          _____
                                                           Honorable Donna M. Ryu
20                                                          United States Magistrate Judge

21

22

23

24

25

26

27

28

[PROPOSED] CONSENT DECREE

# EXHIBIT A

## Exhibit A

### Site Visit Agreement

This Agreement is made by and between Plaintiff California Sportfishing Protection Association ("CSPA") and Defendant CASS, Inc. ("CASS") on the one hand, and each of their respective principals, owners, officers, agents, employees, consultants, attorneys, of counsel, assigns, heirs, beneficiaries, and representatives from, or any other related person or entity, (all parties collectively referred to as the "Parties").  With that understanding, the Parties agree to the following:

> CASS will make its site at 2730 Peralta Street located in Oakland, California available for a site visit beginning at _____ on _____ at ____ and shall be concluded within a reasonable period of time and shall last no more than 2 hours;

> Aqua Terra Aeris Law Group ("Aqua Terra Aeris") will notify CASS of the names of each individual who intend to attend the site inspection at least 24 hours in advance of the visit;

> No more than one CSPA consultant or a previously agreed upon number of CSPA consultants will attend the site visit;

> All of CSPA's representatives and consultants agree to properly identify themselves upon arrival, to comply with all applicable safety and security regulations and protocols while at the site and agree to the Assumption of Risk, Release, and Indemnity Agreement that is attached hereto as **Attachment 1**;

> CSPA's representatives and consultants will be accompanied at all times during the site visit by designated CASS representatives and/or its attorneys, and CSPA's representatives shall not engage in communications with CASS employees or its customers without the express permission from those CASS representatives participating in the site visit;

> CSPA's consultant, alone, will be permitted to take photographs of the areas related to stormwater discharge issues of the site during the inspection.  CSPA agrees to seek authorization and approval from CASS prior to taking photographs of any machinery and/or equipment related to manufacturing and/or processing.  If CASS determines that the photographs may reveal sensitive, confidential, proprietary and/or protected information, or is not reasonably related to the stormwater discharge issues that are the subject of the site visit, CSPA's consultant shall not take the photograph. CSPA agrees that it will not take any photographs of CASS customers' items that are at the site for processing.  CASS agrees to help re-frame requests to restrict the photographs taken by CSPA's consultant to exclude sensitive, confidential, proprietary and/or protected information of CASS and/or its customers. CASS agrees not to unreasonably restrict CSPA's consultant from taking photographs, and where possible, to request a photo be re-framed rather than avoided;

1

Before leaving the site, CASS will review all of the electronic versions of the photos taken and may, after consultation with CSPA and/or its consultant, delete any photos that fail to conform to the principles described above;

A duplicate set of all photographs taken at the site or its surroundings will be provided to CASS and its attorneys no later than seven (7) days after the inspection;

After CASS receives the duplicate set of photographs, CASS has fourteen (14) days to decide whether the photographs taken reveal proprietary/confidential information or comprise CASS's trade secrets.   If CASS believes that any of the photos reveal proprietary/confidential information, comprise CASS's trade secrets, or violate CASS's obligations to protect the proprietary interests of its customers, CASS shall notify CSPA in writing, including any rationale or justification within the fourteen day period and CSPA shall edit or delete the photos that CASS has identified;

All photographs taken will be held confidential and be used for settlement purposes only, and shall not be admissible for any purpose in the litigation;

Any photographs taken during this site inspection will be destroyed or returned within 5 business days of resolution of this matter and all electronic copies of such photographs shall be confirmed under oath to have been properly deleted and that no copies electronic or otherwise are retained;

Any CSPA consultant, or expert who reviews any of the photographs, notes, correspondence or impressions from this site visit shall be required to review this Agreement and sign the amendment attached hereto as **Attachment 2** agreeing to abide by the terms of this Agreement;

The failure to observe any of the terms in this Agreement shall be considered material and prejudicial to the affected Party, and such Party may seek an appropriate remedy from the Court including but not limited to excluding evidence from trial or obtaining a special instruction for the trier of fact to consider in its deliberations; and

CSPA reserves all of its rights to discovery as provided by the Code, including the right to full, formally-noticed site inspections during which CSPA may document conditions at the site with photographs.


THE UNDERSIGNED, HEREBY CERTIFY that they have read this entire Agreement, and have had the terms used herein and consequences hereof explained by an attorney. The undersigned fully understand the terms and consequences.

Aqua Terra Aeris Law Group (Aqua Terra
Aeris)

DATED: _____          By: _____

                        Its _____

CASS Inc. (CASS)

DATED: _____          By: _____

                        Its_____

Attachment 1

## ASSUMPTION OF RISK, RELEASE, AND INDEMNITY AGREEMENT

I understand that I am being given temporary entry to the following property (the "Site"):

2730 Peralta Street located in Oakland, California

In consideration of the forgoing, I agree to the following:

I acknowledge and agree that my entry onto the Site is entirely voluntary and at my own risk. Except for the intentional or negligent acts or omissions of Indemnified Parties, I agree to indemnify, defend, hold harmless and release CASS, Inc., its shareholders, officers, directors, employees, agents, attorneys, successors, assigns, lenders, landlords, trustees, beneficiaries, and any other person(s) related to the Site or the activity at the Site (collectively "Indemnified Parties") from any and all demands, lawsuits, damages, claims, settlements, judgments, losses, liability, or expenses (including interest, attorney fees, and expert witness fees) for personal injury, illness (including without limitation potential exposure to COVID-19), death, or property damage, caused by, arising from or related to my entry onto the Site.

I confirm that at the time of the site inspection that I do not have any communicable disease or symptoms of a communicable disease, including without limitation COVID-19 symptoms as outlined in current Centers for Disease Control guidance including: fever or chills, cough, shortness of breath or difficulty breathing, fatigue, muscle or body aches, headache, new loss of taste or smell, sore throat, congestion or runny nose, nausea or vomiting, and/or diarrhea. I agree that if I have any of these symptoms at the time of the site inspection that I will not be allowed to participate in the site inspection and the site inspection will be cancelled.

I agree that I will wear personal protective equipment at the site inspection, including, but not limited to, the following: protective eye gear (goggles or glasses), face covering (covering both nose and mouth), and closed toe shoes (steel toe shoes). I also agree to maintain at least six feet social distance from all employees and representatives, including attorneys and experts.

I agree that I will not assign my rights or delegate my obligations under this Agreement and that there are no third-party beneficiaries.

I HAVE READ THIS DOCUMENT AND FULLY UNDERSTAND AND AGREE TO EACH AND EVERY PROVISION.

Signature:_____     Company: _____

Name:_____     Title: _____

Purpose of Visit: _____

**Attachment 2**

## Agreement of California Sportfishing Protection Association's (CSPA) Representative

I, _____, am _____ and have read, understand, and agree to comply with, and be bound by, all of the terms and conditions contained in the attached Site Visit Agreement entered into between CSPA and CASS, Inc. (CASS).


By:_____

Title:_____

Signature:_____

Date:_____